UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

MELVIN PORTER,

                                    Plaintiff,

  -against-

NYS DOCCS SERGEANT TIMOTHY BUNCH,
NYS DOCCS OFFICER JOSHUA PAPPAS, NYS
DOCCS OFFICER STEVEN GASCHO, NYS
DOCCS OFFICER MICHAEL SORGE, NYS
DOCCS SERGEANT W. COLE (first name
unknown), NYS DOCCS OFFICER WAITH (first
name unknown), NYS DOCCS NURSE CAROL
LICIAGA, and NYS DOCCS JOHN AND JANE
DOE CORRECTIONAL OFFICERS 1-15,

                                    Defendants.

-------------------------------------------------------------- x

**SECOND AMENDED
COMPLAINT**

Jury Trial Demanded

No. 16 Civ. 5935

<u>PRELIMINARY STATEMENT</u>

In this case, Plaintiff Melvin Porter, who is a sixty-six year-old man, alleges that

Individual Corrections Officers with the New York State Department of Corrections

and Community Supervision ("NYS DOCCS") violated his rights in two recent

incidents while he was in their custody.

First, on December 30, 2014, Defendant Bunch unilaterally and arbitrarily

ordered that Mr. Porter and other inmates be deprived of drinking water, running water

and electricity until someone provided him with requested information, which none of

the inmates had, or could have been expected to have. This action was without

1

justification, did not follow departmental procedures, and violated Mr. Porter's Eighth Amendment right to be free from cruel and unusual punishment, and other rights as well. Mr. Porter challenged the deprivation order using the correctional facility's procedures, and obtained a favorable result stating that Bunch's action was improper.

Next, on November 23, 2015, Defendants Pappas, Sorge, Gascho, Cole and Waith assaulted Mr. Porter, or failed to stop an assault of Mr. Porter when he did not move fast enough for their liking (Mr. Porter's mobility had been impacted by a recent knee surgery and, in fact, at the time of the assault Mr. Porter was on his way back to the facility from a follow up appointment in Manhattan relating to that surgery and arthritis). Then, in an effort to cover up for their misconduct, of which Mr. Porter's injuries were proof, Defendants brought false charges against Mr. Porter falsely stating that he assaulted them first such that they were justified in beating him. Defendant Liciaga failed to intervene to stop that false infraction, participated in created a record that would perpetuate it, and was deliberately indifferent to Mr. Porter's serious medical needs arising from the assault.

As a consequence of Mr. Porter making successful use of the correctional facility's administrative procedures, the fabricated charge against Mr. Porter was dismissed, but not before the seriously-injured Mr. Porter spent roughly one month in punitive segregation under particularly egregious conditions.

## NATURE OF THE ACTION

1.      This is an action to recover money damages for Defendants' violation of Mr. Porter's rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

3.      This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## JURY DEMAND

5.      Plaintiff demands a trial by jury in this action pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

6.      Plaintiff Melvin Porter was incarcerated at Sullivan Correctional Facility in Fallsburg, New York, at all times relevant to this action.

7.      Defendants NY DOCCS Sergeant Timothy Bunch, Sergeant W. Cole, Officer Joshua Pappas, Officer Steven Gascho, Officer Michael Sorge, Officer Waith and New York State John and Jane Doe Correctional Officers 1-15, all individually,

were at all times relevant duly sworn corrections officers, employees and agents of the NYS DOCCS and were acting under the supervision of said department and according to their official duties. They are sued in their individual capacities.

8. As for Defendant Nurse Liciaga, individually, she was at all times relevant a registered nurse, employee and agent of the NYS DOCCS and was acting under the supervision of said department and according to her official duties. Alternatively, Defendant Nurse Carol Liciaga may have worked for a company which has a contract with NYS DOCCS to provide medical services to its inmates at Sullivan. She is sued in her individual capacity.

9. At all times hereinafter mentioned Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York.

10. Each and all of the acts of the Individual Defendants were done by said Defendants while acting within the scope of their employment by Defendant State of New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. In this action Mr. Porter seeks redress for the violation of his constitutional rights. At the time each of the herein described violations occurred, Mr. Porter successfully availed himself of the NYS DOCCS administrative procedures

designed to permit a prisoner to challenge unconstitutional action taken against him by individual officers under color of state law.

## STATEMENT OF FACTS

**Defendant Bunch's December 30, 2014 Deprivation Order**

12.     On or about December 30, 2014, Mr. Porter was being held in A-North Block at Sullivan Correctional Facility.  A few months prior, he had undergone a full knee replacement surgery, and was still taking medications to manage the pain and, more generally, his arthritis.

13.     At the time, Mr. Porter was approximately sixty-six years old.

14.     At the time, Mr. Porter had various medical conditions, and he was taking approximately five categories of medications on a regular basis to address them.

15.     Mr. Porter was taking blood pressure medication.

16.     Mr. Porter was taking sinus medication.

17.     In connection with a serious medical event that had rendered him temporarily paralyzed earlier in life, Mr. Porter took medication for hepatitis C (having contracted the illness through a blood transfusion).

18.     Mr. Porter took medication to treat a serious bowel condition that was a consequence of the same medical event that had caused the temporary paralysis, and which frequently caused him pain and discomfort.

19.     Finally, Mr. Porter was taking pain medications at the time to manage the

pain he suffered from the aforementioned knee replacement surgery, as well as other problems relating to his arthritis.

20.     Early in the morning on December 30, 2014, Mr. Porter and other inmates were transported to the library.

21.     The inmates were transported back to the housing block from the library in a series of "go backs" a few hours later.

22.     All told, roughly sixty inmates resided in the housing block.

23.     At approximately 11:00 AM, when Mr. Porter arrived back at the housing block from the library, he encountered Defendant Bunch searching individuals and cells indiscriminately.

24.     Defendant Bunch frequently worked as the housing unit's supervisor.

25.     When Mr. Porter was allowed back to his cell after the searches, Mr. Porter learned that Defendant Block had directed that the water and electricity be turned off for the entire housing block, leaving him without drinking water, running water, and/or power.

26.     Sergeant Bunch's searches of inmates and their cells was performed in connection with an inventory he had completed of housing block porters' materials. Select inmates who resided in the housing block worked as porters for the housing block.  Among the materials they used was a mop and mop bucket.  The mop bucket had a wringer for the mop.   On information and belief, it was months prior to

December 30, 2014, that the wringer handle had first gone missing. It had never been found, and its absence was periodically noted during inventories of housing block porters' materials.

27.     On December 30, 2014, Defendant Bunch had again noted the missing wringer handle in the context of an inventory and stated, in sum and substance, that the inmates would not have water or power until the wringer handle was found.

28.     Defendant Bunch knew or should have known that NYS DOCCS regulations and other correctional standards required that inmates receive drinking water on a very regular basis.

29.     For example, the American Bar Association's Standards for Criminal Justice states that a correctional facility should "allow unrestricted access for prisoners to potable drinking water and to adequate, clean, reasonably private, and functioning toilets and washbasins." Standards for Criminal Justice, American Bar Ass'n, Standard 23-3.1, available at:

www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html (last accessed Feb. 6, 2017). This same document indicates that "correctional authorities should not withhold food or water from any prisoner." Id. at 23-3.4. It goes on to say that "[i]n no case should restrictions relating to a prisoner's . . . privileges, whether imposed as a disciplinary sanction or otherwise, detrimentally alter a prisoner's: . . . access to water." Id. at 23-3-7. Even

during "lockdown," the Standards state that "prisoners should continue to have unrestricted access to toilets, washbasins, and drinking water." Id. at 23-3.9.

30. As another example, Title 7 from the New York Compilation of Codes, Rules and Regulations, which addresses the Department of Corrections and Community Supervision, states in Section 305.2 the procedures required for the imposition of a deprivation order. In setting forth these procedures, Section 305.2 specifically mentions special considerations and safeguards that the government must employ if a deprivation order cuts off an inmate's water supply. These safeguards include turning the running water back on at extremely regular intervals and with ample notice to the inmates affected. 7 NYCRR 305.2(f); see also NYS DOCCS Directive #4009 (stating that inmates' access to water and electricity are a minimum standard necessary for inmate's cleanliness, health and morale, and that any "deprivation order" which deprives inmates of, inter alia, water and electricity, for reasons of safety and security must be authorized by a correctional facility's Deputy Superintendent for Security).

31. An ordinary person's common sense notions regarding the importance of access to drinking water as a minimal civilized measure of a life necessity, particularly for an elderly man with medical problems requiring him to take multiple medications with water, would permit a reasonable jury to plausibly find that the deprivation of water is sufficiently serious to implicate Eighth Amendment protections.

32.     On information and belief, the correctional facility's electrical systems are part and parcel of its ability to deliver water to the various housing units, such that the deprivation order relating to electricity played a role in the water deprivation.

33.     When viewed in connection with the above-mentioned examples and more, a reasonable jury could plausibly find that Defendant Bunch's unilaterally imposed order that Mr. Porter be deprived of drinking water, running water and power, without the development of concomitant safeguards for Mr. Porter's health and welfare, fell short of the minimal civilized measure of life's necessities.

34.     Defendant Bunch knew from his regular supervision of Mr. Porter's housing block that Mr. Porter and many of the other inmates in the housing block had serious and chronic medical conditions requiring them to take medications on a regular basis.  Thus, Defendant Bunch's order was designed with the knowledge and intent to cause Mr. Porter and similarly situated individuals physical and medical distress.

35.     Defendant Bunch also knew from his regular supervision of Mr. Porter's housing block that Mr. Porter and other inmates in the housing block hewed closely to religious practices requiring regular washing and ablutions.  Thus, Defendant Bunch's order was designed with the knowledge and intent to cause Mr. Porter and similarly situated individuals spiritual, mental and emotional distress by preventing them from complying with these religious practices.

36.     Mr. Porter had never worked as a housing block cleaning porter prior to

December 30, 2014, nor was he on a cleaning porter work detail on the date of December 30, 2014.  In addition, Mr. Porter's cell had been searched many times since between the wringer handle going missing and December 30, 2014.  Thus, Defendant Bunch had no reason to believe that Mr. Porter, of the nearly sixty inmates residing in the housing block, would have the wringer handle in his possession, or would have reason to know anything about the wringer handle's whereabouts.

37.    During the months that the wringer handle was missing, the inmate population in Mr. Porter's housing block had changed.  On a regular basis, inmates had been transferred out of the housing block to other housing blocks within Sullivan and/or to different correctional facilities altogether.  On just as regular a basis, new inmates were transferred into the housing block from other Sullivan blocks or other correctional facilities to take their place.  Thus, on December 30, 2014, Defendant Bunch had no reason to believe that the long-missing wringer handle was still even on the premises of the housing block, or that any one inmate who was part of the December 30, 2014, inmate population was involved in, or had knowledge of, the disappearance of the wringer handle.

38.    In light of the circumstances relating to the wringer handle known to Defendant Bunch on December 30, 2014 (Mr. Porter never working as a porter; the handle having disappeared long before, when a wholly different inmate population resided in the housing block; etc.), Defendant Bunch's order that Mr. Porter and the

other inmates should not have drinking water, running water or power until one or more inmates produced information about the wringer handle (1) had little rational relationship to the stated aim of finding the item; (2) was fundamentally unfair in its withholding of basic human necessities, would shock an objectively reasonable jury's concepts of elemental decency; and (3) was grossly disproportionate to the offense for which it was allegedly imposed, particularly as it was leveled against persons whom Defendant Bunch knew were not responsible for the offense.

39.     Defendant Bunch knew or should have know that the ways in which his order was constitutionally infirm, yet he acted with deliberate indifference to the constitutional damage he inflicted upon his charges, and in contravention of departmental rules designed to protect inmates' constitutional rights from this kind of harm.

40.     There were no particular circumstances to allow Defendant Bunch to reasonably believe that Mr. Porter was involved in or had knowledge of the wringer handle disappearance that Defendant Bunch's order was allegedly designed to address.

41.     Mr. Porter's overall behavior pattern as an inmate in the care and custody of the NYC DOCCS did not support a reasonable belief that Mr. Porter was involved in or would have knowledge of the wringer handle's whereabouts.

42.     At the time, the housing block was generally devoid of any perceptible disciplinary or safety problem that would justify the severe disciplinary measure that the

deprivation of drinking water, running water and power presented.

43.     There were other, more tailored ways of investigating the wringer handle's whereabouts that Defendant Bunch could have employed in lieu of the drastic order depriving Mr. Porter of drinking water, running water and power. When Defendant Bunch was asked why the deprivation order had been imposed, he responded, in sum and substance, that it was because "he said so." This, plus Defendant Bunch's comment, in sum and substance, that he would lift the deprivation order when the wringer handle appeared shows that Defendant Bunch was unconcerned with the relationship of the order to its stated aim, and deliberately indifferent to the danger to Mr. Porter's health and welfare that the deprivation order posed.

44.     As a consequence of Defendant Bunch's deprivation order, Mr. Porter was unable to take his medications and endured physical pain and suffering and other physical manifestations of his medical conditions as a result of his inability to take the medications.

45.     In addition to the actual pain and suffering felt by Mr. Porter as a result of his inability to take his medications, Mr. Porter ran a substantial risk of serious harm as a consequence of the same. As noted, <u>supra</u>, Mr. Porter's various chronic medical conditions were serious in nature. Some of them were and are life threatening if left untreated. Furthermore, the side effects that Mr. Porter could suffer as a consequence of suddenly being rendered unable to take his medications at the same regular intervals

at which his organism has grown accustomed posed their own unique threat to his health separate and apart from the threats that arise from the underlying conditions themselves.

46.     As a consequence of Defendant Bunch's deprivation order, Mr. Porter was unable to perform his ablutions in accordance with his religious beliefs, causing him spiritual, emotional and mental pain and suffering.   This was a known and foreseeable consequence of the deprivation order.   In fact, it can be inferred from Defendant Bunch's actions and statements that his intent was that the water deprivation would cause the inmate population—Mr. Porter included—such distress that an inmate or inmates would give Defendant Bunch some intelligence about the wringer handle. Yet there was no discernable connection between Defendant Bunch's water deprivation, this intended infliction of distress, and Mr. Porter's likely provision of intelligence regarding the wringer handle, for the reasons stated herein.

47.     At the same time, Defendant Bunch knew that inmates have the right to practice their religion without arbitrary and malicious interference.   Correction Law 610 and 9 NYCRR Section 7024 enshrine this right, which of course has exceptions.   Mr. Porter alleges that Defendant Bunch's order did not qualify for any such exception, seeing as how it inflicted an intentional interference with no rational penological aim.

48.     Because the turning off of the water was an intentional act meant to deprive Mr. Porter of his right to basic human sustenance, this could also causally

implicate its other alleged effect on Mr. Porter's ability to exercise his right to practice his religion.

49.     Mr. Porter is unaware of any facts that would permit the foreseeable religious distress caused by the order to be the <u>de minimis</u> result of a legitimate government regulatory mechanism.

50.     Instead, Mr. Porter's experience of the order and Defendant Bunch's related statements and actions suggests, as stated herein, that it can be inferred that the order was meant to wantonly and unreasonably inflict suffering and distress upon the subject inmates.

51.     To the extent that Defendants characterize Mr. Porter's First Amendment injury as de minimis, the related jurisprudence only applies if Defendant Bunch's deprivation order rationally sought to achieve some legitimate penological end in the first instance, but fell short of that rational aim.  Here, Defendants inflicted this injury upon Mr. Porter's First Amendment rights wantonly and gratuitously, as they did the injury to his right to have access to drinking water and his medications.

52.     After Defendant Bunch imposed the deprivation order, he was then called away to a different part of Sullivan Correctional Facility and did not return until much later.  In the meantime, he left the deprivation order in effect.  It was not until approximately 6:30 PM before Defendant Bunch returned and restored the water and electricity.  By this time, Mr. Porter had gone without drinking water, running water and

power for more than eight hours, the last time having been before he left for the library in the early morning.

53.    Defendant Bunch's intentional and malicious use of water deprivation and electricity deprivation to coerce inmate behavior was unjustified and severe punishment which a reasonable jury could plausibly find to shock the conscience of civilized society.

54.    Defendant Bunch's intent can be inferred from his statements in imposing the order, and his malice can be inferred from the lack of any rational relationship between Defendant Bunch's order and his alleged intended aim.

55.    Defendant Bunch's actions and the dangers they created did not take place to address an emergency situation.

56.    Defendant Bunch's unconstitutional act caused Mr. Porter the harm that naturally flows from the deprivation of drinking water, running water and electricity. In addition, Mr. Porter, due to his advanced age and illnesses, suffered greatly at the loss of water because, inter alia, (1) he needed water to drink, but was deprived of same; (2) he needed water to take his medications, and was unable to take the medications, but was deprived of same, causing him physical pain and suffering; and (3) he needed water to perform his religious washings and ablutions, but was deprived of same, causing him spiritual, emotional and mental pain and suffering.

57.    At the same time the water deprivation posed the dangers herein described, Defendant Bunch's order that the power be shut off created a sufficiently

serious risk of harm in the event that the water deprivation caused one of the medical events it threatened to cause. In other words, a medical intervention to address a medical event caused by the water deprivation would have been complicated by the lack of power and the related inability to use any medical rescue or monitoring equipment that depends upon electricity. For example, movement of an inmate suffering a medical event would have been complicated (in light of the fact that the facility depended heavily upon cells and corridors secured through electrically-powered locks; the use of defibrillators would have been complicated; the use of machines to monitor an inmate's vital signs would have been complicated; and more). Yet at the same time the lack of power hobbled the facility's ability to address a serious medical event, the water deprivation threatened to cause one.

58. Mr. Porter timely followed Sullivan Correctional Facility's grievance procedure and Mr. Porter also timely filed a Notice of Intention with the NYS Attorney General, both of which challenged Defendant Bunch's December 30, 2014, actions.

59. In the context of the investigation that took place after Mr. Porter filed his grievance, Defendant Bunch and Defendant Officer Doe, who failed to intervene to stop the infliction of the unconstitutional deprivation order, falsely stated that the inmates did not suffer greatly due to the lack of water because they claimed that facility staff shuttled water into the housing block manually to compensate. This was not true, and the false statement was designed to make DOCCS investigators incorrectly believe

that the inmates generally and Mr. Porter specifically, did not suffer the actually threatened consequences of Defendant Bunch's act, although they did.

60.     In spite of Defendant Bunch's efforts to minimize what occurred, the Central Office Review Committee concluded that going forward, "[i]t is recommended that all staff . . . not subject the inmate population to conditions that amount to a clear violation of the 8th amendment that precludes any cruel and unusual treatment."

**Defendants' November 23, 2015 Assault Of Mr. Porter And Their Fabrication Of Charges Against Him**

61.     In September 2014, Mr. Porter had knee replacement surgery.

62.     The surgery required Mr. Porter to make regular visits to hospital for follow up treatment and check-ups.  His chronic arthritis complicated a full and quick recovery.

63.     On November 23, 2015, Mr. Porter was taken to Montefiore Medical Center for one of these follow up visits.

64.     Three other inmates also joined Mr. Porter's trip to receive off-site medical care in order to receive medical treatment for themselves.  Two of these inmates, on information and belief, were Michael McQuilkin and Derrick Thompson.

65.     At the end of the day, Mr. Porter and the three other inmates arrived back at Sullivan Correctional Facility where they were brought in through the infirmary intake area.

66.     Of the four inmates, Mr. Porter was the last to enter the infirmary intake area, as he still used a cane and walked slowly as a consequence of his knee.

67.     When Mr. Porter entered the infirmary intake area, he found that there were only two chairs, which were already occupied by two of the three inmates who had come in before him.  These two inmates were sitting down in order to have their restraints removed.  The third inmate had gone to the bathroom.

68.     Mr. Porter thus stood against the wall, stretching his legs after having just been sitting in a vehicle for the roughly four-hour drive from Montefiore to Fallsburg, NY.

69.      After one of the inmates had his restraints removed, he got up from the chair, and Defendant Pappas told Mr. Porter to sit down in the now-empty chair for his turn.

70.     Mr. Porter was in the process of going to the chair when the third inmate returned from the bathroom and sat in the chair so that his restraints could be taken off.

71.     Upon seeing the third inmate in the chair, Defendant Pappas began angry that Mr. Porter had not moved more quickly to sit down as Defendant Pappas had ordered him.

72.     Defendant Pappas told Mr. Porter, in sum and substance, that he would "deal with [him] later."

73.     Once the other three inmates had their restraints removed, Defendant Pappas sent them to their respective blocks such that Mr. Porter remained the only inmate left in the infirmary intake area.

74.     Defendant Pappas grabbed Mr. Porter by the collar and asked, in sum and substance, "What the fuck is wrong with you?"

75.     Defendant Sorge and Defendant Pappas then used unjustified physical force to throw Mr. Porter to the floor, whereupon Defendant Pappas, Defendant Sorge, and Defendant Gascho, who was also in the room, punched, kicked and hit Mr. Porter with their batons.  This assault was also wholly unjustified and Defendants' blows landed, among other places, on Mr. Porter's back, legs and shoulders.  In addition, one or more Defendants punched Mr. Porter in the head with a closed fist.

76.     Defendants placed Mr. Porter in mechanical restraints and issued an alert to falsely signal to others on duty that Mr. Porter had himself acted out in some way requiring physical force.  This was not true.  Mr. Porter did not ever assault or attempt to assault any of Defendants or other staff.

77.     Defendant Waith hurried into the infirmary intake in response to the alert and, despite the fact that he saw that Mr. Porter was in restraints and wholly submissive, immediately joined in on the assault, helping Defendant Pappas, Defendant Sorge and Defendant Gascho in picking Mr. Porter's entire body upon, whereupon the group deliberately ran Mr. Porter's head into the wall.

78.    Defendant Sergeant Cole also responded to the assault and, finding it still ongoing, participated or failed to intervene to stop it.

79.    Defendants took Mr. Porter to see Defendant Liciaga, who took some photographs of Mr. Porter and took notes without any intent or reasonable effort to accurately document and treat his injuries.  Instead, Defendant Liciaga's photos and notes were unreasonably and intentionally designed to minimize the injuries that Mr. Porter suffered as a result of Defendants' misconduct.

80.    Stated differently, Defendant Liciaga elected to minimize Mr. Porter's assault-related injuries knowing that this would benefit the assaulting Defendants in their subsequent filing and prosecution of a false infraction against Mr. Porter, and this election prioritized participation in and/or failure to intervene to stop other Defendants' violation of Mr. Porter's due process rights.  As a consequence of Defendant Liciaga's misconduct, Mr. Porter was treated minimally for minimal injuries when he in fact had serious ones.  Then, Mr. Porter was sent to punitive segregation to suffer related physical pain and suffering without medical care.

81.    At the same time that Defendant Liciaga's misconduct implicated Mr. Porter's due process rights and aggravated their violation vis-à-vis the disciplinary proceeding arising from the false infraction, it also constituted deliberate indifference to Mr. Porter's serious medical needs.  Mr. Porter, who has just suffered, among other things, head trauma; shoulder, arm, leg, back injuries; and re-injury to his recently

replaced knee, was sent to punitive segregation with no acknowledgement or sincere treatment of those injuries.

82.    The mis-handling of Mr. Porter's head and knee injuries constituted the wanton infliction of unnecessary pain and deliberate indifference to his serious medical needs.  As just one example, Mr. Porter reported head injuries to her that were visible and which were caused, as per his account to her, by Defendants ramming his head into a wall.  Yet Defendant Liciaga did not examine Mr. Porter regarding such serious trauma to the head.  Nor did she recommend that he be sent off site for serious examination for head trauma by a nearby hospital, despite the possibility that head trauma as reported to her, and as manifested on Mr. Porter's own person, could cause brain swelling, which in turn could develop into permanent brain damage and even death.

83.    In punitive segregation, Mr. Porter suffered chronic and substantial pain in the form of, among other things, untreated migraine headaches, dizziness, and blackout spells.  Mr. Porter also suffered great fear, knowing the risks of head trauma and knowing that his had gone untreated as he experienced these serious physical symptoms.

84.    Due to Defendant Liciaga's mis-handling of his medical situation, Mr. Porter was not only not properly treated on site, but he was not permitted to receive medical treatment off-site.  Instead, he was only sent to punitive segregation.

85.    Also in punitive segregation, Mr. Porter suffered great pain in his back,

inability to sleep, and inability to walk without experiencing great pain and suffering.

86.     Defendant Pappas wrote an infraction report falsely accusing Mr. Porter—a sixty-six year-old man with an injured leg requiring him to use a cane—with violent conduct, creating a disturbance, assault on staff and refusing a direct order.

87.     As a result of Defendant Pappas's fabrications, Mr. Porter had to spend roughly twenty-eight days in punitive segregation suffering significant and painful physical injury awaiting a disciplinary hearing.

88.     At the December 21, 2015, disciplinary hearing, the hearing officer took testimony from Defendant Pappas, Defendant Sorge, Defendant Gascho, two of the three inmates who arrived back at Sullivan Correctional Facility with Mr. Porter, and Mr. Porter himself.

89.     The hearing officer found Mr. Porter not guilty of the gravest charges—violent conduct, creating a disturbance, and assault on staff—because Defendants' testimonies about what happened when they were all in the same room together that night bore too many inconsistencies.  It is Mr. Porter's contention that the reason for the inconsistencies is that the charges against him were maliciously fabricated.

90.     The hearing officer found Mr. Porter guilty only of refusing a direct order, stating that Mr. Porter had admitted the "offense" of "not mov[ing] quick [sic] enough" when he was "initially directed to sit down in the chair to have his restraints removed." As a consequence of Mr. Porter not moving quickly enough (due to a disability that

everyone involved readily acknowledged), the hearing officer noted that "the vacant chair was taken by 1 of the 3 other Sullivan inmates" before Mr. Porter could take it. The hearing officer sentenced Mr. Porter to time served and loss of recreation, loss of packages, loss of commissary, and loss of phone privileges already suffered, for the fact that his physical disability precluded him from moving more quickly. Again, it is Mr. Porter's contention that this was to cover for the misconduct of the Defendant officers.

91.      Defendants' assault of Mr. Porter caused him new severe physical injuries, aggravated his existing injuries, including his knee replacement for which he was still in recovery, caused him mental and emotional trauma, and more. In terms of Mr. Porter's physical injuries, he suffered and continues to suffer migraine headaches, dizziness, excruciating pain in his back, shoulders, arms and legs. Mr. Porter experiences sleeplessness as well.

92.      As a result of the foregoing, Mr. Porter is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## **FIRST CLAIM**
## **42 U.S.C. § 1983**

93.      Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

94. Defendants, by their conduct toward Plaintiff alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983, the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

95. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

96. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
### Excessive Force

97. Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

98. Defendants violated the Fourth and Fourteenth Amendments in using excessive and unjustified physical force against Plaintiff as described herein, causing him serious physical harm in the process.

99. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

100. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM
## Cruel and Unusual Punishment

101.    Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

102.    Defendants violated the Eighth and Fourteenth Amendments because a reasonable jury would find their actions against Mr. Porter as described herein to be objectively shocking and because Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

103.    The question of whether a prison measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether the measure was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the purposes of causing harm.  Here, Defendants did not act in good faith to maintain or restore discipline in imposing the deprivation order upon Mr. Porter; in assaulting him; or in filing and prosecuting a false infraction against him to exonerate themselves of their bad acts.

104.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FOURTH CLAIM
## Deliberate Indifference to Serious Medical Needs

105.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

106.     Defendants violated the Eighth and Fourteenth Amendments because their actions as described herein caused a serious deleterious effect to Mr. Porter's health and bodily integrity and Defendants knew that Mr. Porter had fragile health that was vulnerable such that they had the requisite culpable state of mind when committing their actions.

107.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

108.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

**FIFTH CLAIM**
**Deprivation of Due Process**

109.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

110.     Defendant Bunch and the Assaulting Defendants violated the Fifth and Fourteenth Amendments because his acts deprived Mr. Porter of a cognizable

constitutional interest in an arbitrary fashion, causing him great harm in the process as herein described.

111.   The cognizable constitutional interests in question include the right to elemental human sustenance in the form of drinking water, or the right to exercise one's religion without the government deliberately and intentionally exploiting your rights in this regard to obtain an alleged—but unsupported by evidence—penological objective.

112.   In addition, the cognizable constitutional interests in question include the right to be free from arbitrary deprivation of liberty.  When discussing whether and to what extent an incarcerated convicted inmate's liberty interest has been abrogated to support a due process violation, courts consider whether the extent of the abrogation creates an atypical inmate experience.  Here, Mr. Porter not only had to undeservedly spend time in punitive segregation, which differed from the typical inmate experience in terms of recreation, access to programs, physical space, personal privacy, meals, access to hygiene, access to social outlets, and more, Mr. Porter had to endure this time while suffering great physical pain as a consequence of the Defendants' deliberate indifference to his serious medical needs, and need for medical treatment.

113.   In terms of the deprivation order, the fact that Defendants rendered a decision and took action without complying with their employer's own regulations barring the exploitation of a human's right to water and religious expression for

unsupported and untailored penological purposes supports Mr. Porter's claim that Defendants violated his due process rights.

114.     Defendant Bunch's unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

115.     As a direct and proximate result of Defendant Bunch's unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

### SIXTH CLAIM
### Failure To Intervene

116.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

117.     Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

118.     Accordingly, Individual Defendants who failed to intervene violated the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

119.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

120.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

121.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective State authority, which is forbidden by the United States Constitution.

122.    As a result of the foregoing, Mr. Porter is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiff respectfully request the following relief:

A. An order entering judgment for Plaintiff against Defendants on each of their claims for relief;

B. Awards to Plaintiff for compensatory damages against all Defendants, jointly and severally, for their violation of the Fourth, Fifth, Eighth and Fourteenth Amendment rights of Plaintiff, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

C. Awards to Plaintiff of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Plaintiff, the amount to be determined at jury trial, which Plaintiff respectfully demand pursuant to FRCP 38;

D. Awards to Plaintiff of the costs of this action, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:    February 6, 2017
New York, New York

Ryan Lozar
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562
Fax: 1-877-666-4456
ryanlozar@gmail.com

*Attorney for Plaintiff*