UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MELVIN PORTER,

                    Plaintiff,

          v.

NYS DOCCS SERGEANT TIMOTHY
BUNCH; NYS DOCCS OFFICER JOSHUA
PAPPAS; NYS DOCCS OFFICER STEVEN
GASCHO; NYS DOCCS OFFICER
MICHAEL SORGE; NYS DOCCS
SERGEANT W. COLE (first name
unknown); NYS DOCCS OFFICER WAITH
(first name unknown); NYS DOCCS
NURSE CAROL LICIAGA; and NYS
DOCCS JOHN AND JANE DOE
CORRECTIONAL OFFICERS 1-15,

                    Defendants.

No. 16-CV-5935 (KMK)

OPINION & ORDER

Appearances:

Ryan Michael Lozar, Esq.
Law Firm of Ryan Lozar
New York, NY
*Counsel for Plaintiff*

Colleen Kelly Faherty, Esq.
New York Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Melvin Porter ("Plaintiff") filed the operative Third Amended Complaint,

pursuant to 42 U.S.C. § 1983, against New York State Department of Corrections and

Community Supervision ("NYS DOCCS") Sergeant Timothy Bunch ("Bunch"), NYS DOCCS

Officer Joshua Pappas ("Pappas"), NYS DOCCS Officer Steven Gascho ("Gascho"), DOCCS

Officer Michael Sorge ("Sorge"), NYS DOCCS Sergeant W. Cole ("Cole"), NYS DOCCS

Officer Waith ("Waith"), NYS DOCCS Nurse Carol Liciaga ("Liciaga"), and NYS DOCCS John and Jane Doe Correctional Officers 1-15 (collectively, "Defendants"). (*See* Third Am. Compl. ("TAC") (Dkt. No. 71).)[1] Plaintiff alleges that Defendants violated his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. (*See id.* ¶ 1.)

Before the Court is Defendants' Partial Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (the "Motion"). (*See* Not. of Mot. (Dkt. No. 84).) For the following reasons, Defendants' Motion is granted.

<u>I. Background</u>

<u>A. Factual Background</u>

The following facts are taken from the TAC and are accepted as true for the purposes of this Motion. At the time of the events described herein, Plaintiff was incarcerated at Sullivan Correctional Facility ("Sullivan") in Fallsburg, New York. (TAC ¶ 6.)

<u>1. The December 30, 2014 Deprivation Order</u>

On December 30, 2014 ("December 30"), Plaintiff resided in the A-North Block at Sullivan, which housed roughly sixty inmates. (*Id.* ¶¶ 12, 22.) Plaintiff was sixty-six years old at the time, and taking "approximately five categories of medications on a regular basis" to address various medical conditions. (*Id.* ¶¶ 13–14.) A few months prior, Plaintiff had undergone full knee replacement surgery, and was still taking medication "to manage the pain and, more generally, his arthritis." (*Id.* ¶¶ 12, 19.) Plaintiff was also taking blood pressure and sinus medication, as well as medication for a bowel condition and hepatitis C, medical issues that

---

[1] The Complaint sues all Defendants only in their individual capacities. (*See* TAC ¶ 7.)

resulted from "a serious medical event that had rendered him temporarily paralyzed earlier in life." (*Id.* ¶¶ 15–18.)

Early in the morning on December 30, Plaintiff was transported to the library. (*Id.* ¶ 20.) When he returned to his housing block at approximately 11:00 a.m., he encountered Defendant Bunch, who had been working as the regularly scheduled supervisor of Plaintiff's housing unit for at least six months, "searching individuals and cells indiscriminately." (*Id.* ¶¶ 23, 24A.) Bunch's search was performed in connection with "an inventory he had completed of housing block porters' materials," which had indicated that the handle of a mop wringer (the "wringer handle") had gone missing. (*Id.* ¶ 26.) Plaintiff alleges that the wringer handle went missing "months prior to December 30, 2014," but had never been found, and that "its absence was periodically noted during inventories of housing block porters' materials." (*Id.*) When Plaintiff was allowed back in his cell after the searches, he learned that Bunch had directed that all water and electricity be turned off for the entire housing block (the "deprivation order"), "leaving him without drinking water, running water, and/or power." (*Id.* ¶ 25.) On December 30, Bunch had "again noted the missing wringer handle in the context of an inventory" and "stated, in sum and substance, that the inmates would not have water or power until the wringer handle was found." (*Id.* ¶ 27.) "At some point, which [Plaintiff] understands to have been after the water-deprivation order had been issued and concluded," Bunch stated that he issued the deprivation order so that no one would flush the wringer handle. (*Id.* ¶ 37A.) Plaintiff alleges that due to its size and shape, it was "physically impossible" to flush the missing wringer handle. (*Id.* ¶ 37B.) Plaintiff never worked as a housing block cleaning porter and his cell had already been searched many times since the wringer handle had gone missing. (*Id.* ¶ 36.)

After Bunch imposed the deprivation order, he was called away to a different part of Sullivan, leaving the order in effect. (*Id.* ¶ 52.) He did not return until 6:30 p.m., when he restored the water and electricity. (*Id.*) By that time, Plaintiff had gone without drinking water, running water, and electricity for more than eight hours, the last time having been before he was taken to the library early that morning. (*Id.*) During the entire period, Plaintiff was not given anything to drink, and the inmates "were kept on keeplock." (*Id.* ¶ 52A.)[2]

Plaintiff alleges that Bunch "knew from his regular supervision of [Plaintiff's] housing block" that Plaintiff and many other inmates had serious and chronic medical conditions requiring them to take medications on a regular basis. (*Id.* ¶ 34.) Specifically, as full-time housing unit supervisor for Plaintiff's housing block, Bunch's desk "was right by the place where [Plaintiff] was required to turn in his requests for sick call, which were then satisfied through coordinators between medical service providers at the facility and the housing area supervisors/officers, including Bunch." (*Id.* ¶ 34A.) Because of his ailments, Plaintiff made many sick call requests, of which Bunch was aware because of "his having to participate in coordinat[ing] the requests' satisfaction with medical." (*Id.*) Additionally, Plaintiff alleges that Bunch was aware that Plaintiff was a practicing Muslim, and that he "hewed closely to religious practices requiring regular washing and ablutions." (*Id.* ¶ 35.) Plaintiff followed an ablution schedule in connection with his Muslim faith, and often performed ablutions in front of Bunch. (*Id.* ¶ 35C.)

As a result of the deprivation order, Plaintiff was unable to take his medications because his "constitution is such that he is unable to swallow pills dry," and as a result "endured physical

---

[2] Plaintiff alleges that keeplock "was not a normal status for the housing area," (TAC ¶ 52A), but does not explain what keeplock status entailed in this context.

pain and suffering and other physical manifestations of his medical conditions as a result of his inability to take the medications." (*Id.* ¶¶ 44, 56A.) Plaintiff also "ran a substantial risk of serious harm" because some of his medical ailments were life threatening if not treated properly, which includes taking his medication "at the same regular intervals at which his organism has grown accustomed." (*Id.* ¶ 45.) Additionally, Plaintiff "was unable to perform his ablutions in accordance with his religious beliefs, causing him spiritual, emotional[,] and mental pain and suffering." (*Id.* ¶ 46.) Plaintiff also asserts that the deprivation of water and power could have impeded medical intervention if a medical emergency had arisen. (*Id.* ¶ 57.)

Plaintiff filed a grievance and a Notice of Intention with the New York State Attorney General based on the deprivation order. (*Id.* ¶ 58.) In the resulting investigation, Bunch and Officer Doe ("Doe"), who "failed to intervene to stop the infliction of the unconstitutional deprivation order," falsely stated that facility staff "shuttled water into the housing block manually to compensate" for the water deprivation. (*Id.* ¶ 59.) Nevertheless, IGRC concluded that "[i]t is recommended that all staff . . . not subject the inmate population to conditions that amount to a clear violation of the 8th amendment that precludes any cruel and unusual treatment." (*Id.* ¶ 60.) Plaintiff alleges that "[o]n information and belief, Bunch's use of the water-deprivation order resulted in disciplinary action against him"; Plaintiff asserts that the IGRC finding, issued some time after the incident, stated that Bunch "would be instructed on his return to work," thereby implying that he had been at least temporarily suspended from his duties, and also alleges that Bunch "never returned to work" in Plaintiff's housing area. (*Id.* ¶¶ 60A, 60D.) The IGRC also recommended that all staff be properly trained "so as not to commit future 8th amendment violations." (*Id.* ¶ 60B.) Plaintiff alleges that "[o]n information and belief, somewhere nearing 50% of the inmates in the housing area file[d] grievances . . .

relating to the water-deprivation order.  In addition, many inmates filed suit in Claims Court."
(*Id.* ¶ 60E.)

### 2.  The November 23, 2015 Assault

Because of his September 2014 knee replacement surgery, Plaintiff made regular follow-up visits to an outside hospital.  (*Id.* ¶¶ 61–62.)  On November 23, 2015, Plaintiff and three other inmates were taken to Montefiore Medical Center ("Montefiore") for medical appointments.  (*Id.* ¶¶ 63–64.)  After their appointments, Plaintiff and the three other inmates returned to Sullivan, where they were brought in through the infirmary intake area.  (*Id.* ¶ 65.)  Plaintiff was the last to enter, as he still used a cane and walked slowly because of his knee surgery.  (*Id.* ¶ 66.)  When Plaintiff entered the infirmary area, there were two chairs available for inmates to sit and have their restraints removed, and both were already occupied by two of the other inmates who had arrived with him from Montefiore, while the third returning inmate had gone to the bathroom. (*Id.* ¶ 67.)  Plaintiff stood against the wall stretching his legs while he awaited his turn to sit.  (*Id.* ¶ 68.)  After having his restraints removed, one of the seated inmates got up, and Defendant Pappas told Plaintiff to sit down in the vacant chair.  (*Id.* ¶ 69.)  Plaintiff began walking toward the chair, but before he reached it the fourth inmate returned from the bathroom and sat in the chair first.  (*Id.* ¶ 70.)  Pappas became angry that Plaintiff had not moved quickly enough to sit down, and told Plaintiff he would "deal with [him] later."  (*Id.* ¶ 72.)  Once the other three inmates had their restraints removed, Pappas sent them back to their respective housing blocks and Plaintiff remained alone in the infirmary intake area with the escorting corrections officers. (*Id.* ¶ 73.)  Pappas then grabbed Plaintiff by the collar and asked, "[w]hat the fuck is wrong with you?"  (*Id.* ¶ 74.)  Pappas and Defendant Sorge then threw Plaintiff to the floor where they, along with Defendant Gascho, "punched, kicked[,] and hit [Plaintiff] with their batons," landing blows

on his back, legs, and shoulders; at least one of the officers also punched Plaintiff in the head "with a closed fist." (*Id.* ¶ 75.) Defendants then placed Plaintiff in mechanical restraints and "issued an alert to falsely signal to others on duty that [Plaintiff] had himself acted out in some way requiring physical force." (*Id.* ¶ 76.) Defendant Waith responded to the alert and "hurried into the infirmary intake" and, although he saw that Plaintiff was "in restraints and wholly submissive," joined in the assault, including by helping Pappas, Sorge, and Gascho pick up Plaintiff and "r[u]n [Plaintiff's] head into the wall." (*Id.* ¶ 77.) Defendant Cole also responded to the assault and, "finding it still ongoing, participated or failed to intervene to stop it." (*Id.* ¶ 78.)

After the assault, Defendants took Plaintiff to Defendant Liciaga, who took photographs of Plaintiff and took notes that "were unreasonably and intentionally designed to minimize the injuries that [Plaintiff] suffered." (*Id.* ¶ 79.) As a result, Plaintiff was "treated minimally for minimal injuries when he in fact had serious ones." (*Id.* ¶ 80.) Plaintiff alleges that Liciaga did this intentionally to facilitate the fabrication of disciplinary charges against Plaintiff, which ultimately resulted in Plaintiff being sent to punitive segregation. (*Id.* ¶¶ 79, 81.) Plaintiff's head injuries "were visible," and were caused, "as per [Plaintiff's] account to [Liciaga]," by Defendants' ramming his head into a wall. (*Id.* ¶ 82.) However, Liciaga "did not examine" Plaintiff for head trauma or send him to an outside hospital for treatment. (*Id.*) Plaintiff was "not properly treated," "not permitted to receive medical treatment off-site," and "sent to punitive segregation." (*Id.* ¶ 84.)

### 3. Plaintiff's Disciplinary Hearing and Punitive Segregation

After the assault, Pappas wrote an infraction report falsely charging Plaintiff with violent conduct, creating a disturbance, assaulting staff, and refusing a direct order. (*Id.* ¶ 86.) Plaintiff

was placed in punitive segregation awaiting a disciplinary hearing, despite not having received medical treatment and thus still suffering from his injuries.  (*Id.* ¶ 87.)  On December 21, 2015, a disciplinary hearing was held, and the hearing officer took testimony from Pappas, Sorge, and Gascho, as well as from Plaintiff himself.  (*Id.* ¶ 88.)  Plaintiff was found not guilty of three of the charges—violent conduct, creating a disturbance, and assaulting staff—because Defendants' testimony "bore too many inconsistencies."  (*Id.* ¶ 89.)  However, he was found guilty of refusing a direct order; the hearing officer stated that Plaintiff had committed the offense of "not mov[ing] quick enough" when directed to sit down to have his restraints removed.  (*Id.* ¶ 90.)  Plaintiff was sentenced to "time served and loss of recreation, loss of packages, loss of commissary, and loss of phone privileges already suffered."  (*Id.* ¶ 90.)  Plaintiff's assault, and subsequent confinement without receiving medical treatment for his new and exacerbated injuries, resulted in physical, mental, and emotional injuries.  (*Id.* ¶ 91.)  Plaintiff continues to suffer from migraines, dizziness, "excruciating pain in his back, shoulders, arms[,] and legs," and sleeplessness.  (*Id.*)

### 4.  Plaintiff's Claims

Plaintiff brings six causes of action against all Defendants, but does not specify which Defendants he asserts each claim against, or what conduct or incident each claim pertains to. Plaintiff's first claim is a standalone claim under 42 U.S.C. § 1983 for violating Plaintiff's constitutional rights.  (*Id.* ¶¶ 93–96.)  The second claim is for excessive force in violation of "the Fourth and Fourteenth Amendments."  (*Id.* ¶¶ 97–100.)  Plaintiff's third claim is for cruel and unusual punishment in violation of "the Eighth and Fourteenth Amendments."  (*Id.* ¶¶ 101–104.) The Fourth claim is for deliberate indifference to Plaintiff's medical needs in violation of "the Eighth and Fourteenth Amendments."  (*Id.* ¶¶ 105–108.)  The Fifth claim is for deprivation of

Plaintiff's right to due process in violation of "the Fifth and Fourteenth Amendments." (*Id.* ¶¶ 109–115.) Plaintiff's sixth and final claim is for failure to intervene in violation of "the First, Fourth, Fifth, Eighth[,] and Fourteenth Amendments." (*Id.* ¶¶ 116–122.) Plaintiff seeks compensatory damages, punitive damages, attorneys' fees and costs, and "[s]uch further relief as this Court deems just and proper." (*Id.* at 36.)

### B. Procedural Background

Plaintiff initiated this Action on July 25, 2016. (Compl. (Dkt. No. 1).) On October 21, 2016, before any Defendant had been served, Plaintiff filed his First Amended Complaint. (First Am. Compl. ("FAC") (Dkt. No. 3).) On January 17, 2017, Defendants filed a pre-motion letter in anticipation of moving to dismiss certain claims. (Dkt. No. 24.) Plaintiff responded on January 20, 2017, arguing that he had sufficiently pled his claims, and seeking leave to amend if the Court found his claims deficient. (Dkt. No. 26.) The Court granted Plaintiff leave to amend, (Dkt. No. 27), and Plaintiff filed the Second Amended Complaint on February 6, 2017, (Second Am. Compl. ("SAC") (Dkt. No. 28)).

On March 2, 2017, Defendants filed a pre-motion letter in anticipation of moving to dismiss certain claims in the Second Amended Complaint. (Dkt. No. 32). The Court held a pre-motion conference on May 31, 2017, (Dkt. (minute entry for May 31, 2017)), and issued a scheduling order for Defendants' motion, (Dkt. No. 47), as well as a case management plan and scheduling order for discovery, (Dkt. No. 48).

On December 15, 2017, the Court held oral argument on Defendants' Motion To Dismiss. The Court reserved ruling on Plaintiff's claims and gave Plaintiff a deadline of January 8, 2018 to file a letter indicating whether he intends to file an amended complaint "curing the defects discussed on the record at the oral argument." (Dkt. (minute entry for Dec. 15, 2017); Transcript

90 (Dkt. No. 81).)  On January 9, 2018, Plaintiff filed a letter seeking leave to amend his complaint, which the Court granted the same day.  (Dkt. Nos. 65, 66.)

Plaintiff filed the Third Amended Complaint on January 24, 2018.  (*See* TAC.)  On January 27, 2018, Defendants filed a pre-motion letter seeking leave to file a motion to dismiss claims from the TAC, (Dkt. No. 70), and Plaintiff responded on January 29, 2018, (Dkt. No. 72).  The Court set a briefing schedule for the motion on January 30, 2018.  (Dkt. No. 76.)  Defendants filed the instant Motion To Dismiss on March 13, 2018.  (Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 85); Defs.' Decl. in Supp. of Mot. To Dismiss ("Defs.' Decl.") (Dkt. No. 86).)  Plaintiff filed a response on April 16, 2018.  (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 87).)  After being granted an extension, (Dkt. No. 90), Defendants filed a reply on May 7, 2018, (Defs.' Reply in Further Supp. of Mot. To Dismiss ("Defs.' Reply") (Dkt. No. 92)).

## II.  Discussion

### A.  Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (citation, alteration, and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to

relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563 (citation omitted), and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (citation and quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (citation, alteration, and quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d

302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted).

### B. Analysis

#### 1. 42 U.S.C. § 1983

Plaintiff's first cause of action asserts that Defendants, "by their conduct toward Plaintiff . . . , violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983, the First, Fourth, Fifth, Eighth[,] and Fourteenth Amendments to the Constitution of the United States." (TAC ¶ 94.) However, § 1983 provides a mechanism "for redress for the deprivation of rights," but "itself creates no substantive rights." *Corley v. City of New York*, No. 14-CV-3202, 2017 WL 4357662, at *5 (S.D.N.Y. Sept. 28, 2017) (quoting *Thomas v. Roach*, 165 F.2d 137, 142 (2d Cir. 1999)); *see also Pagan v. New York State Div. of Parole*, No. 98-CV-5840, 2001 WL 262611, at *8 (S.D.N.Y. Mar. 15, 2001) (holding that the plaintiff's "due process claims . . . can only be brought under [§ 1983]" because the defendant was acting under color of state law). Plaintiff therefore cannot assert an independent cause of action based on a standalone § 1983 claim.

#### 2. Excessive Force

Plaintiff's second claim is for use of excessive force in violation of the Fourth and Fourteenth Amendments. (TAC ¶ 98.) Defendants have not moved to dismiss this claim, (*see* Defs.' Mem. 1 n.1), and the Court thus will not address it. However, the Court notes that "[i]n the context of a claim by a prisoner that he was subjected to excessive force by prison

employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and

unusual punishments," rather than either of the Amendments Plaintiff cites. *Wright v. Goord*,

554 F.3d 255, 268 (2d Cir. 2009).

### 3. Cruel and Unusual Punishment

Plaintiff's third claim is for cruel and unusual punishment in violation of the Eighth and

Fourteenth Amendments. (TAC ¶ 102.) Because Plaintiff was a convicted prisoner at the time of

the events underlying the TAC, (*see id.* ¶ 112), his conditions of confinement claim based on the

deprivation order arises under the Eighth Amendment, *see Delacruz v. City of New York*, No. 15-

CV-3030, 2017 WL 2377984, at *3 (S.D.N.Y. May 31, 2017) ("Conditions of confinement

claims brought by convicted prisoners are governed by the Cruel and Unusual Punishments

Clause of the Eighth Amendment, whereas claims brought by pre-trial detainees are governed by

the Due Process Clause of the Fourteenth Amendment." (citing *Darnell v. Pineiro*, 849 F.3d 17,

29 (2d Cir. 2017))), *adopted by*, 2017 WL 2963490 (S.D.N.Y. July 11, 2017), *appeal dismissed*,

No. 17-2542, 2018 WL 6267098 (2d Cir. Mar. 14, 2018).[3]

### a. Applicable Law

The Eighth Amendment's prohibition on the imposition of "cruel and unusual

punishments," U.S. Const. amend. VIII, "sets constitutional boundaries on the conditions of

imprisonment," *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). "Although the

Constitution does not require comfortable prison conditions, the conditions of confinement may

not involve the wanton and unnecessary infliction of pain." *Walker v. Schult*, 717 F.3d 119, 125

(2d Cir. 2013) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981)); *see also Seymore v.*

---

[3] As discussed, Plaintiff's excessive force claim also arises under the Eighth Amendment, but Defendants have not moved on this claim. (*See* Defs. Mem. 1 n.1.)

*Dep't of Corr. Servs.*, No. 11-CV-2254, 2014 WL 641428, at *3 (S.D.N.Y. Feb. 18, 2014) ("[T]he

Second Circuit . . . has explained that because society does not expect or intend prison conditions

to be comfortable, only extreme deprivations are sufficient to sustain a conditions-of-

confinement claim." (alteration and quotation marks omitted) (quoting *Blyden v. Mancusi*, 186

F.3d 252, 263 (2d Cir. 1999))).  To state a cognizable Eighth Amendment challenge to conditions

of confinement, a plaintiff must plead both an objective element and a mental-state element.  *See*

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The objective element requires a plaintiff

demonstrate the existence of conditions that are "sufficiently serious," such that he was denied

"the minimal civilized measure of life's necessities," *id.* (citation omitted), that is, conditions that

"either alone or in combination[ ] pose an unreasonable risk of serious damage to [the plaintiff's]

health," *Walker*, 717 F.3d at 125 (citing *Rhodes*, 452 U.S. at 347).  "[T]here is no static test to

determine whether a deprivation is sufficiently serious; the conditions themselves must be

evaluated in light of contemporary standards of decency."  *Id.* (citation omitted).  The mental-

state element requires a plaintiff demonstrate that the defendant acted with "deliberate

indifference."  *Farmer*, 511 U.S. at 835.  "Deliberate indifference is a mental state equivalent to

subjective recklessness, as the term is used in criminal law."  *Salahuddin v. Goord*, 467 F.3d 263,

280 (2d Cir. 2006) (citing *Farmer*, 511 U.S. at 839–40).  A defendant "cannot be found liable

under the Eighth Amendment for denying an inmate humane conditions of confinement unless

the official knows of and disregards an excessive risk to inmate health or safety; the official must

be both aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  "A prison official

may be found to have had a sufficiently culpable state of mind if he participated directly in the

alleged event, or learned of the inmate's complaint and failed to remedy it, or created or

permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). The plaintiff must, in other words, allege "more than mere negligence." *Farmer*, 511 U.S. at 835.

### b. Application to Plaintiff

Plaintiff argues that the approximately eight-hour deprivation of running water and power imposed by Bunch's deprivation order "categorically violates human decency and [was] objectively unreasonable." (Pl.'s Mem. 11.) Defendants argue that the deprivation was a de minimis burden on Plaintiff that is insufficient to state an Eighth Amendment claim. (Defs.' Mem. 7–8.)

The Second Circuit "has been reluctant to impose bright-line durational or severity limits in conditions of confinement cases." *Darnell*, 849 F.3d at 31. Rather, "conditions of confinement cases must be evaluated on a case-by-case basis according to severity and duration." *Id.* at 37. Here, it is not clear that an eight-hour deprivation of water, and consequently, being unable to take medications with water for that period, deprived Plaintiff of "the minimal civilized measure of life's necessities," or that it was objectively serious "in light of contemporary standards of decency." *Walker*, 717 F.3d at 125; *see also Rhodes*, 452 U.S. at 349 ("[T]he Constitution does not mandate comfortable prisons."). Indeed, Courts are divided on whether such limited deprivations of water or electricity can support an Eighth Amendment claim. *Compare Collins v. Coughlin*, No. 88-CV-650, 1990 WL 154717, at *1 (W.D.N.Y. Oct. 10, 1990) (denying summary judgment to both parties where "the plaintiff allege[d] that his Eighth Amendment rights were violated when corrections officials turned off the water to the entire B– Block housing unit for over eleven hours, while allegedly conducting a search for contraband," thereby depriving inmates of "water for drinking and . . . taking medicine and for hygienic and

religious ablutions"), *with Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 272 (N.D.N.Y. 2018) (finding no Eighth Amendment violation where the plaintiff was temporarily deprived of electricity, running water, and meals); *see also Ames v. Stigler*, No. 07-CV-430, 2009 WL 9097015, at *3 (N.D. Ill. Sept. 3, 2009) (dismissing Eighth Amendment claim where, during a housing block shutdown pursuant to a contraband search, the plaintiff "was handcuffed for approximately five to six hours, denied food for 9 hours, water and restroom access, and for three and a half hours at most, was in 80–85 degree heat in a crowded segregation yard").

However, even assuming that the TAC pleads an objectively serious deprivation, it fails to plausibly allege that Bunch acted with deliberate indifference. Plaintiff alleges that Bunch "knew from his regular supervision of [Plaintiff's] housing block that [Plaintiff] and many of the other inmates in the housing block had serious and chronic medical conditions requiring them to take medications on a regular basis." (TAC ¶ 34; *see also id.* ¶ 24 (alleging that Bunch "frequently worked as the housing unit's supervisor").) Plaintiff further alleges that Bunch must have known of Plaintiff's medical conditions, medications, and medication schedules because part of his job was to coordinate sick call requests with medical staff, and Plaintiff made many such requests due to his various ailments. (*Id.* ¶ 34A.) However, the TAC does not allege any facts suggesting that Bunch knew, or that it was obvious, that Plaintiff required water to take those medications, or that Plaintiff requested water to take his medication during the deprivation period and was denied. Nor does Plaintiff specify how many instances of taking his regular medication that he was deprived of during the period of the water shutdown, or specify which medication he would have normally taken during that time and for what conditions, or indicate what specific harm he suffered from being deprived of those medications, instead only generally

alleging that he "was unable to take his medications and endured physical pain and suffering and other physical manifestations of his medical conditions."  (*Id.* ¶ 44.)

First, where denial or delay in dispensing of medication is at issue, courts have found such bare allegations of pain and suffering insufficient to establish serious harm in the deliberate indifference context.  *See Walker v. Dep't of Corr. Serv.*, No. 11-CV-993, 2012 WL 527210, at *2 (S.D.N.Y. Feb. 14, 2012) (dismissing Eighth Amendment claim where the plaintiff "allege[d] only that [he] sustained pain in his kidney," because although "[i]t is possible that [the] plaintiff did suffer the type of 'extreme pain' that plausibly states an Eighth Amendment violation . . . the complaint offers no such detail of that pain"); *Paterson v. Goord*, No. 06-CV-211, 2008 WL 623123, at *8 (N.D.N.Y. Mar. 4, 2008) ("[A] plaintiff's subjective complaints of pain do not, in and of themselves, constitute factual allegations plausibly suggesting the existence of a serious medical need."); *Kee v. Hasty*, No. 01-CV-2123, 2004 WL 807071, at *22 (S.D.N.Y. Apr. 14, 2004) ("[B]are allegations of mental suffering and/or physical 'pain' are, without more, insufficient to satisfy the stringent standard for pleading a serious injury."); *Evans v. Bonner*, 196 F. Supp. 2d 252, 257 (E.D.N.Y. 2002) (holding that "the bare allegation of pain and suffering in the complaint . . . is insufficient" to sustain Eighth Amendment claim (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986))). Furthermore, Plaintiff asserts that he is 'unable to swallow pills dry," (TAC ¶ 56A), but makes no allegation that Bunch was aware of this fact or that he raised this issue with any officer and was ignored.  Thus, even assuming the allegations establish that Bunch must have known Plaintiff took medications for several medical conditions, Plaintiff has not sufficiently alleged that Bunch, or any other officer, knew the temporary eight-hour water deprivation would prevent Plaintiff from taking his medication, and that the temporary deprivation would therefore put him at risk.

*See Walker*, 2012 WL 527210, at *2 (finding no deliberate indifference for a deprivation of drinking water claim because the complaint contained "no allegations that [the] defendant . . . acted with scienter," such as "any reference to what [the] defendant . . . knew regarding [the] plaintiff's alleged [medical] condition"); *Cruz v. Jackson*, No. 94-CV-2600, 1997 WL 45348, at *7 (S.D.N.Y. Feb. 5, 1997) (holding that plaintiff did not plausibly allege "deliberate indifference to his need for clean drinking water," because he did not allege "that the [d]efendants knew about the rust in the water or that he informed them of it"); *cf. Collins v. Coughlin*, No. 88-CV-650, 1991 WL 173206, at *2 (W.D.N.Y. Aug. 30, 1991) (denying summary judgment to both parties where "[t]here remains a dispute whether the plaintiff asked for and was denied drinking water" during eleven-hour water shut down for contraband search). Indeed, courts have found that denial of a single dose, or even several doses, of a needed medication insufficient to support a deliberate indifference claim. *Smith v. Carpenter*, 316 F.3d 178, 188–89 (2d Cir. 2003) (finding no constitutional violation because of two alleged episodes of missed HIV medication where the plaintiff failed to present evidence of permanent or on-going harm or an unreasonable risk of future harm stemming from missed doses); *Youngblood v. Artus*, No. 10-CV-752, 2011 WL 6337774, at *7 (N.D.N.Y. Dec. 19, 2011) (granting motion to dismiss deliberate indifference claim where the defendant "failed to give [the plaintiff] a single dose of his seizure medication" and the plaintiff did not specify resulting harm caused); *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (dismissing deliberate indifference claim based on "a delay of several days in dispensing plaintiff's hypertension medication" absent evidence "the delay gave rise to a significant risk of serious harm"); *Evans v. Bonner*, 196 F. Supp. 2d 252, 256 (E.D.N.Y. 2002) (granting summary judgment for defendant on claim that medication was not timely distributed

because "the alleged injury to the plaintiff resulting from not getting his medicine 'on time' does not rise to a 'sufficiently serious' level").

Moreover, while the Complaint alleges that Bunch "knew or should have known" that DOCSS regulations required that inmates receive drinking water on a regular basis, (TAC ¶ 28), this fact does not equate to Bunch's knowledge that failure to abide by the DOCCS regulations would "pose an unreasonable risk of serious damage to [Plaintiff's] health," *Walker*, 717 F.3d at 125. *See Farmer*, 511 U.S. at 832 (requiring that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] to the plaintiff); *Clay v. Lee*, No. 13-CV-7662, 2017 WL 436041, at *6 (S.D.N.Y. Jan. 30, 2017) ("Merely stating that Defendants 'knew or should have known' of the conditions is insufficient to demonstrate deliberate indifference."); *Rennalls v. Alfredo*, No. 12-CV-5300, 2015 WL 5730332, at *5 (S.D.N.Y. Sept. 30, 2015) ("At most, Plaintiff's claims suggest that [the defendant] was negligent in failing to follow security protocol. Under the second prong of [an Eighth Amendment] claim, however, a plaintiff must allege a culpable state of mind." (citing *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996))).

Even drawing the inference that Bunch imposed the deprivation order as a disciplinary measure to coerce the inmates into revealing the wringer handle's location, rather than as a safety measure, (*see* TAC ¶ 43 (Bunch imposed the deprivation order "because 'he said so'"); *id.* ¶¶ 27, 43 (Bunch stating that the order would not be lifted until the wringer handle was found or appeared); *id.* ¶ 42 (alleging that "the housing block was generally devoid of any perceptible disciplinary or safety problem"); *id.* ¶ 37 (alleging that the housing block population had changed over the past several months due to transfers in and out); *id.* ¶ 36 (alleging that Plaintiff's cell had already been "searched many times" since the wringer handle went missing)),

that fact alone does not establish that Bunch imposed the deprivation order *knowing* it would expose Plaintiff to a substantial risk of harm from not taking his medications, but chose to disregard that risk. *See Trammell v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003) (explaining that the question is "not simply whether the [deprivation] [o]rder was imposed with 'deliberate indifference' to [the plaintiff's] health and safety, for it is indisputable that the [o]rder was intended to make [the plaintiff] uncomfortable in an effort to alter his behavior," but rather "whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [the plaintiff's] health and safety"); *see also Calhoun v. Wagner*, No. 93-CV-4075, 1997 WL 400043, at *4 (E.D. Pa. July 14, 1997) ("[E]ven if [the defendant] was responsible for the water shut-off to [the] plaintiff's cell, because of the legitimate purpose behind the action and the short duration of the alleged deprivation, the factual situation does not give rise to a constitutional violation."); *cf. Walker*, 2012 WL 527210, at *2 ("If plaintiff is able to plead that he informed [the defendant] as to his alleged medical problem, and that [the defendant] understood the condition to necessitate allowances or accommodations that [the defendant] purposely withheld from plaintiff, such allegations may support a claim for deliberate indifference.").

Additionally, although the Complaint alleges that Bunch was "called away to a different part" of the prison and left the deprivation order "in effect," (TAC ¶ 52), without imposing any "safeguards" providing for intermittent water in the interim, (*id.* ¶ 33), the TAC does not allege any facts suggesting that this was intentional rather than "mere negligence," *Salahuddin*, 467 F.3d at 280; *see also Trammell*, 338 F.3d at 165 ("Negligence does not . . . satisfy the scienter requirement necessary to support a claim for 'cruel and unusual punishment.'" (citation omitted)); *LaBounty v. Coughlin*, 137 F.3d 68, 72–73 (2d Cir. 1998) (explaining that the

defendants' acts must "involve[] more than lack of due care, but rather . . . obduracy and wantonness in placing [the plaintiff's] health in danger" (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986))).  And finally, nowhere does Plaintiff allege that during this time, he requested water to take his medication, or informed any officer that he could not take his medication without water, and was denied.  *See Walker*, 2012 WL 527210, at *2 (granting motion to dismiss Eighth Amendment claim where the plaintiff did not allege that he "informed [the defendant] as to his . . . medical problem" and was not accommodated as needed).

Because the Complaint fails to plausibly allege that Bunch acted with deliberate indifference to conditions that posed an unreasonable risk of serious damage to Plaintiff's health or safety, *Walker*, 717 F.3d at 125, the Court grants Bunch's Motion to Dismiss Plaintiff's Eighth Amendment claim.[4]

### 4.  Deliberate Indifference to Serious Medical Needs

Plaintiff's fourth claim is for deliberate indifference to serious medical needs in violation of the Eighth Amendment.  The TAC does not specify which Defendant this claim is asserted against, but the Parties treat this claim as pertaining only to Liciaga, (*see* Defs. Mem. 20–22; Pl.'s Mem. 4 n.1, 26–30); the Court will therefore treat it as such.  A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment, because it is an allegation that "conditions of confinement [are] a form of punishment," and thus is a "violation of [the] Eighth Amendment right to be free from cruel and unusual punishments."  *Darnell*, 849 F.3d at 35.

---

[4] Because Plaintiff's conditions of confinement claim is dismissed, the Court need not reach Defendants' argument that Section 1997e(e) of the Prisoner Litigation Reform Act ("PLRA") bars Plaintiff's claim.  (*See* Defs.' Mem. 11–12.)

<u>a. Applicable Law</u>

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (quotation marks omitted). In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125. Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin*, 467 F.3d at 279, and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "When the basis for a prisoner's Eighth Amendment claim is a temporary delay

or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith v*, 316 F.3d at 185–86 (quotation marks omitted).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted). This means that the defendant must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation and quotation marks omitted)). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (quotation marks omitted). However, "mere negligence" is not sufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (quotation marks omitted). Neither is "mere disagreement over the proper treatment . . . create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

<u>b. Application to Plaintiff</u>

Plaintiff alleges that after he was assaulted, he was brought to Liciaga for treatment, but that Liciaga "elected to minimize [Plaintiff's] assault-related injuries" in order to benefit the officers who assaulted him "in their subsequent filing and prosecution of a false infraction against [Plaintiff]." (TAC ¶¶ 79–80.) Plaintiff alleges that despite suffering from head trauma, shoulder, arm, leg, and back injuries, and re-injury to his recently replaced knee, he was "sent to punitive segregation with no acknowledgement or sincere treatment of those injuries." (*Id.* ¶ 81.) Furthermore, Plaintiff alleges that he specifically reported his head injuries to Liciaga and told her that his head was rammed into a wall, and that she "did not examine [him] regarding such serious trauma to the head," nor refer him to an outside hospital. (*Id.* ¶ 82.) Plaintiff asserts that because he received no treatment for his head injuries, he suffered "chronic and substantial pain in the form of, among other things, untreated migraine headaches, dizziness, and blackout spells." (*Id.* ¶ 83.)

Defendants argue that Plaintiff fails to state a claim for deliberate indifference to his medical needs against Liciaga because his allegations amount to "[m]ere medical malpractice," which is insufficient to establish the subjective prong of the deliberate indifference analysis. (Defs. Mem. 21.) Defendants also argue that Plaintiff's allegations that Liciaga omitted facts about Plaintiff's injuries from her documentation of the incident do not demonstrate that she was deliberately indifferent to his medical needs. (*Id.* at 21–22.) Finally, Defendants argue that Plaintiff's allegations regarding Liciaga's motive "are completely conclusory." (*Id.* at 22.)

With respect to the objective prong, concussive head trauma, depending on severity, can be sufficiently serious enough to support an Eighth Amendment deliberate indifference claim. *See McKinney v. New Haven Police Dep't*, No. 17-CV-1663, 2017 WL 5137583, at *3 (D. Conn.

Nov. 6, 2017) ("Although a mild concussion has been held insufficient to constitute a serious medical need, [the plaintiff's] concussion may have been more serious."); *Snoussi v. Bivona*, No. 05-CV-3133, 2010 WL 3924255, at *6 (E.D.N.Y. Feb. 17, 2010) (finding the plaintiff properly pled an objectively serious medical condition where he alleged he "sustained injuries as a result of 'violent blows to the head,' which caused a concussion"), *adopted by* 2010 WL 3924683 (E.D.N.Y. Sept. 29, 2010). Here, Plaintiff alleges that his head was rammed into a wall, and that after the event he suffered "chronic and substantial pain" in the form of "untreated migraine headaches, dizziness, and blackout spells." (TAC ¶ 83.) At this stage, and given that Plaintiff alleges he received no treatment at all, the Court finds that Plaintiff has plausibly alleged a sufficiently serious injury to meet the objective prong.

However, the Court agrees that Plaintiff's claims are too conclusory with respect to the subjective prong to state a deliberate indifference claim against Liciaga. Although Plaintiff alleges that Liciaga must have known he suffered from a serious medical condition because his injuries were visible, he nowhere indicates what they looked like such that Liciaga would be on notice that his injuries were severe. More significantly, Plaintiff does not plead any facts with respect to what Liciaga did or said that would enable the Court to infer that Liciaga actually knew of and disregarded a substantial risk to Plaintiff's health. There are no allegations regarding what Liciaga said or did in response to Plaintiff's report of his head injuries, only that she treated him "minimally" and that she took photos and notes "without any intent or reasonable effort to accurately document and treat his injuries." (TAC ¶¶ 79–80.) Plaintiff does not specify what Liciaga recorded his injuries to be, what "minimal" treatment he did receive, or what she said to Plaintiff that indicated she was aware that he had suffered serious injuries but nonetheless would not treat them. *See Hanner v. Westchester County*, No. 16-CV-7610, 2019 WL 1299462,

at *5 (S.D.N.Y. Mar. 21, 2019) (dismissing deliberate indifference claim where the plaintiff conclusorily alleged that the defendants "ignored [her] obvious conditions" and "'refused' [the] plaintiff a pap smear despite knowing she had fibroids"); *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 274 (N.D.N.Y. 2018) ("[The] [p]laintiff's conclusory allegation that [the defendant] refused to treat him or send him to a hospital fails to plausibly suggest that the defendant was deliberately indifferent to any serious medical need."); *Jimenez v. Sommer*, No. 14-CV-5166, 2017 WL 3268859, at *8 (S.D.N.Y. July 28, 2017) (holding "conclusory assertion" that the defendant "was aware of [the plaintiff's injury] but failed to recommend proper medical treatment" fails to "indicate that [the defendant] had the requisite culpable state of mind to satisfy the subjective prong of a deliberate[] indifference claim" (citation omitted) (collecting cases)); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *10 (S.D.N.Y. Mar. 29, 2016) (collecting cases for the proposition that "[c]onclusory allegations that medical staff defendants were aware of a [prisoner's] medical needs and failed to provide adequate care are generally insufficient to state an Eighth Amendment claim of inadequate medical care"); *Flemming v. Wright*, No. 11-CV-804, 2013 WL 4804493, at *12 (N.D.N.Y. Sept. 9, 2013) (finding that the plaintiff's "conclusory allegation that he complained to [the] [d]efendants, without any factual detail whatsoever regarding the alleged complaints and the individual [d]efendants' responses, cannot be found sufficient to satisfy the subjective element—a showing of deliberate indifference . . . —of his Eighth Amendment claim").

Plaintiff relies on *Ellis v. Guarino*, No. 03-CV-6562, 2004 WL 1879834 (S.D.N.Y. Aug. 24, 2004), in support of his argument that he has stated a deliberate indifference claim because Liciaga must have been aware of his visible injuries. In *Ellis*, the court denied a motion to dismiss where the plaintiff sufficiently pled that his injuries from an assault by correction officers

were visible, concluding that "it is reasonable to infer that [the defendant nurse] observed his physical injuries, heard his description of his symptoms and the attacks, and was thus fully aware of his serious medical condition." 2004 WL 1879834, at *12. However, the plaintiff there pled far more specific details about his injuries, including that he "suffered a one-millimeter cut on the cornea of his right eye, contusions in both ears, and swelling on the side of his face," and that he informed the nurse defendant that he suffered "ringing in his ears, headaches, dizziness, and blurred vision." *Id.* at *2. The plaintiff in *Ellis* also gave more detail about the nurse's reaction, including that he requested to see a doctor but that she refused the request, and that she gave him aspirin instead. *Id.* Notably, the plaintiff in *Ellis* was also pro se, which required the court to "interpret his complaint to raise the strongest arguments it suggests." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citation omitted). Plaintiff, who is counseled, includes no details regarding what about his injuries was visible and thus would have put Liciaga on notice that he suffered a serious injury, and no allegations specifying how Liciaga responded when informed of Plaintiff's injuries that would suggest she disregarded a serious risk to Plaintiff's health. *See Davis v. McCready*, No. 14-CV-6405, 2017 WL 627454, at *1, 5 (S.D.N.Y. Feb. 15, 2017) (dismissing deliberate indifference claim where the plaintiff alleged he told the defendant of his medical issues and related pain and requested medication but only generally alleged that the defendant "'purposely ignor[ed]' his 'serious medical needs'"); *cf. Liner v. Fischer*, No. 11-CV-6711, 2013 WL 4405539, at *2 (S.D.N.Y. Aug. 7, 2013) (denying motion to dismiss where the plaintiff alleged that the defendant told him "that he could not provide [the plaintiff] with [needed] medication due to budget cuts," indicating an improper consideration).

Furthermore, although he alleges that Liciaga "minimized" Plaintiff's injuries in order to benefit the officers who assaulted him and subsequently filed a false infraction against Plaintiff,

(TAC ¶¶ 79–80), he does not assert any facts from which the Court could draw that conclusion. *See Nash v. Kressman*, No. 11-CV-7327, 2013 WL 6197087, at \*9 (S.D.N.Y. Nov. 27, 2013) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citing *Iqbal*, 556 U.S. at 678)). For example, he does not say that Liciaga, or any other Defendant, said anything that gave Plaintiff this impression, or that anything at his hearing led him to understand that Liciaga had intentionally helped the other Defendants fabricate misbehavior charges against Plaintiff. Nor does he explain what Liciaga wrote in Plaintiff's medical records that "minimized" his true injuries, or how it violated his Eighth Amendment rights. *See Rose v. Garritt*, No. 16-CV-3624, 2018 WL 443752, at \*7 n.13 (S.D.N.Y. Jan. 16, 2018) ("[I]t is far from settled that falsification of medical records alone violates the Eighth Amendment." (collecting cases)). Without such facts, Plaintiff's conclusory assertions that Liciaga conspired with Defendants to fabricate charges against him are insufficient to establish that Liciaga was deliberately indifferent to Plaintiff's medical needs. *See Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." (citation and quotation marks omitted)); *cf. Fox v. Fischer*, No. 04-CV-6718, 2005 WL 1423580, at \*4 (S.D.N.Y. June 14, 2005) (disregarding "[p]laintiff's claim that defendants conspired to deprive him of [medication] and access to an E.N.T. in order to cut costs," because "even if not filed in forma pauperis, a 'complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss'" (quoting *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999))), *aff'd*, 242 F. App'x 759 (2d Cir. 2007).

Plaintiff's claim against Liciaga for deliberate indifference to his medical needs is therefore dismissed.

### 5. Deprivation of Due Process

Plaintiff's fifth claim is for deprivation of due process in violation of the Fifth and Fourteenth Amendments. (TAC ¶ 110.) Because Defendants are state actors, rather than federal actors, Plaintiff's due process claim arises under the Fourteenth Amendment. Plaintiff clarifies in his memorandum that he seeks to assert only a procedural due process claim against Bunch in connection with the December 30 deprivation order. (Pl.'s Mem. 4 n.1.)

### a. Applicable Law

"[T]o present a [procedural] due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted). The Court first determines whether a liberty interest is implicated "and, if it is," then it determines "what process is due before the plaintiff may be deprived of that interest." *DeCastro v. City of New York*, No. 16-CV-3850, 2017 WL 4456554, at *12 (S.D.N.Y. Sept. 30, 2017) (quoting *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011)). "The appropriate process depends on the balancing of three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of erroneous deprivation of such interest through the procedures used;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)), *as amended* (July 18, 2017).

<u>b. Application to Plaintiff</u>

The TAC alleges that Bunch, by imposing the deprivation order, deprived Plaintiff of his liberty interest in access to water without due process. (*See* TAC ¶¶ 110–111, 113.) Specifically, Plaintiff alleges that the deprivation order did not comply with DOCCS regulations. (*Id.* ¶ 113.) His briefing focuses on 7 N.Y.C.R.R. § 305.2, which sets forth the requirements for imposing a deprivation order "when it is determined that a threat to the safety and security of staff, inmates, or state property exists." *Id.* § 305.2(a).

Under § 305.2, a deprivation order must be authorized by a high-ranking official, and the authorization "must be confirmed in writing within 24 hours with . . . one copy to the inmate." *Id.* § 305.2(b). The deprivation order then "must be reviewed on a daily basis by" a high-ranking official, who must document his or her review and, if the order "has been in effect for seven days," the superintendent and inmate "shall receive a written notice of renewal on the seventh day." *Id.* § 305.2(c). That "written order and any notice of renewal thereafter must briefly state the reason(s) for the deprivation and contain . . . notice to the inmate" that they may write to the supervisor "to make a statement on the need for continuing the deprivation order." *Id.* § 305.2(d). Finally, if the order "depriv[e]s an inmate of in-cell water, the inmate's cell water shall be turned on for at least 10 minutes, five times per day," and "[s]taff shall notify the inmate prior to turning on the water and record the times that the water is turned on and off." *Id.* § 305.2(f).

To begin, "Plaintiff does not possess a protected liberty interest in having [Bunch] follow prison policy." *Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at *12 (S.D.N.Y. Nov. 20, 2017) (citation omitted); *see also Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("An alleged violation of a prison policy, directive, or regulation, in and of

itself, does not give rise to a federal claim, because '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.'" (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990))); *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002) ("[T]he law is settled that the failure to follow a DOC[C]S Directive or prison regulation does not give rise to a federal constitutional claim." (citation omitted)).  Indeed, New York's prison regulations "provide more protection to inmates than the [C]onstitution requires." *Bradshaw v. City of New York*, No. 17-CV-1199, 2017 WL 6060781, at *19 (S.D.N.Y. Dec. 7, 2017) (citation omitted).

Plaintiff cites cases holding that § 305.2 specifically creates a liberty interest, *see DeMaio v. Mann*, 877 F. Supp. 89, 94 (N.D.N.Y. 1995) (holding that [§] 305.2 is "sufficiently definite to create a liberty interest in the inmate"); *Young v. Scully*, No. 91-CV-4332, 1993 WL 88144, at *3 (S.D.N.Y. Mar. 22, 1993) (holding § 305.2(a), "by requiring specific substantive predicates for issuance of deprivation orders, creates a liberty interest which may not be deprived without due process").  Both of those cases involved greater liberty deprivations than the one alleged by Plaintiff—deprivation "of out of-cell activities and certain privileges" for long periods, *DeMaio*, 877 F. Supp. at 94, and an "administrative confinement," *Young*, 1993 WL 88144, at *3.  And, more importantly, those decisions were based on the "mandatory" language "requiring specific substantive predicates" in § 305.2, but "the Supreme Court [later] changed th[at] rule" in *Sandin v. Conner*, 515 U.S. 472 (1995), holding that "while states may still under certain circumstances create a liberty interest protected by the Fourteenth Amendment's Due Process Clause, the interest 'will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Smith v. Burge*, No. 03-CV-0955, 2006 WL 2805242, at *9 (N.D.N.Y. Sept. 28, 2006) (quoting *Sandin*,

515 U.S. at 483–84). There are no cases binding on this Court since the *Sandin* decision "holding that [§ 305.2] confers on Plaintiff a procedural due process right." *Id.*; *cf. Sims v. Goord*, No. 03-CV-1099, 2007 WL 952071, at *16 (N.D.N.Y. Mar. 29, 2007) (applying *Sandin* analysis to conditions of confinement claim based on deprivation order issued under §305.2).

In any event, even if § 305.2 does create a liberty interest, the TAC does not plausibly allege that § 305.2 was violated here. The deprivation only lasted eight hours, rendering the 24-hour notice provision of § 305.2(b) inapplicable. *See Burge*, 2006 WL 2805242, at *10 ("7 N.Y.C.R.R. § 305.2 expressly provides only that inmates be provided a copy of the deprivation order *within 24 hours* of the deprivation."). The TAC does not provide enough information for the Court to discern whether § 305.2(f), which pertains to deprivation of cell water and requires that in cases of such deprivation, the water must "be turned on for at least 10 minutes, five times per day," was violated—even if the water was off for 8 hours, there were 16 other hours that day in which Plaintiff could have received drinking water for "at least 10 minutes, five times." Furthermore, none of the provisions of § 305 requires Plaintiff to receive *pre-deprivation* notice and an opportunity to be heard. *See Burge*, 2006 WL 2805242, at *10 (concluding that the "24-hour filing-and-service deadline" in § 305.2 "does not deprive inmates of an opportunity to be heard 'at a meaningful time,' as required by the Supreme Court," and noting that "[r]equiring that an inmate be provided notice and an opportunity to be heard within a few hours of a deprivation of property . . . would appear to be administratively unfeasible from a correctional facility's perspective").

Even assuming that Plaintiff possessed a more generalized liberty interest in access to water, Plaintiff does not allege what *process* he was deprived of. Plaintiff received notice of the shut-off when he returned to his cell, (TAC ¶ 25), and was permitted to seek redress for the

deprivation through DOCCS' grievance procedures, (*id.* ¶¶ 11, 58, 60).  Plaintiff does not explain

why he was entitled to any additional *pre-deprivation* process or how it would have prevented

the deprivation order here, particularly when the deprivation was only 8 hours long.  *See Burge*,

2006 WL 2805242, at *10 (noting that because the plaintiff was told "at the time of the

deprivation" why the deprivation order was being imposed, he "was arguably provided *notice* of

the reason for the deprivation sufficient for him later to be able to dispute that reason" and,

because he was later given the opportunity to object to the reasons, had "an *opportunity to be

heard with regard to the deprivation*").  Indeed, if Bunch imposed the deprivation order

"unilaterally" only "because [he] said so," (TAC ¶¶ 33, 43), it is unclear how the State could

have provided Plaintiff with predeprivation process.  *See Zinermon v. Burch*, 494 U.S. 113, 129–

30 (1990) (explaining that the proper inquiry is "whether the *state* is in a position to provide for

predeprivation process," not whether "an individual state employee [is able] to foresee the

deprivation" when analyzing an inmate's claim that a prison guard intentionally deprived him of

property (quotation marks omitted)); *id.* at 132 (explaining that "in situations where a deprivation

hearing is unduly burdensome in proportion to the liberty interest at stake, or where the State is

truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation

remedies might satisfy due process"); *cf. Bailey v. Pataki*, 708 F.3d 391, 401–02 (2d Cir. 2013)

(concluding that predeprivation process was required because the deprivation was foreseeable

and occurred "at a 'predicable point,'" as opposed to being "random or unanticipated so as to

prevent the State from planning for and then providing predeprivation process" (quoting

*Zinermon*, 494 U.S. at 136)); *Patterson v. Coughlin*, 761 F.2d 886, 892–93 (2d Cir. 1985)

(holding that the plaintiff was entitled to a hearing before being placed in disciplinary

segregation for 65 days because it "implicates a sufficiently strong liberty interest as to require

notice of the charges and . . . some opportunity to present a defense" and "it was not impossible or impracticable to provide such procedures" (citation omitted)).

Plaintiff cites *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1 (1978), which noted that "the discontinuance of water or heating for even short periods of time may threaten health and safety." *Id.* at 18.  (*See* Pl.'s Mem. 24 n.24.)  However, the *Memphis Light* Court was referring to utility service for private citizens, not intermittent water deprivation for inmates.  *Id.*; *see also Sandin*, 515 U.S. at 484 (explaining that inmates' liberty interests protected by the Due Process Clause include freedom only from those restraints and conditions "impos[ing] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life").  Plaintiff's argument that his incarceration means his due process liberty interests are even more strongly implicated than the private citizens in *Memphis Light* by the temporary deprivation of water is thus contradicted by Supreme Court precedent.[5]

Therefore, absent further factual allegations regarding what process Plaintiff was entitled to and deprived of, the Court grants Bunch's Motion to Dismiss the procedural due process claim.

## 6.  Failure to Intervene

Plaintiff's final cause of action is for failure to intervene in violation of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments.  (TAC ¶ 118.)  It is not clear whom Plaintiff intends

---

[5] Plaintiff also cites another Supreme Court case, but it is in the context of substantive, not procedural, due process.  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action set by . . . the Due Process Clause.").  Plaintiff asserts no substantive due process claim in this Action.  Furthermore, the *DeShaney* Court discussed this rationale with respect to Eighth Amendment conditions of confinement claims, a claim Plaintiff indeed brought in this Action and the Court has already addressed.

to assert such claims against or for what conduct. Defendants moved to dismiss the claim against Liciaga and Bunch based on the TAC's allegations that Liciaga "failed to intervene to halt the violation of [Plaintiff's] due process rights," and that Bunch interfered with Plaintiff's First Amendment rights. (Defs. Mem. 20.) However, Plaintiff clarifies in his Memorandum that he intended to bring "Excessive Force and Related Failure-To-Intervene Claims" against Pappas, Sorge, Gascho, Cole, and Waith, (Pl.'s Mem. 4 n.1), but otherwise makes no mention of his failure to intervene claims. To the extent Plaintiff sought to assert failure to intervene claims against any of the Defendants who were present at his assault but who are ultimately found not to have participated, Defendants have not moved to dismiss any claim relating to the use of excessive force. The failure to intervene claims therefore survive with respect to Pappas, Sorge, Gascho, Cole, and Waith in connection with their alleged assault of Plaintiff; however, any failure to intervene claim that the TAC could be construed as asserting against Liciaga or Bunch is dismissed.

### 7. First Amendment Free Exercise Claims

Although the TAC makes several references to Plaintiff's religious exercise being burdened by the December 30 deprivation order, Plaintiff does not assert a cause of action under the First Amendment. Nonetheless, Defendants move to dismiss any asserted First Amendment claim, (*see* Defs. Mem. 12–17), and Plaintiff argues he has sufficiently stated a claim, (*see* Pl.'s Mem. 22–24). The Court will therefore address Plaintiff's claim that the deprivation order substantially burdened practice of his religion.

### a. Applicable Law

The Free Exercise Clause of the First Amendment is an "unflinching pledge to allow our citizenry to explore . . . religious beliefs in accordance with the dictates of their conscience."

*Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). A prisoner's First Amendment rights, however, are "[b]alanced against . . . the interests of prison officials charged with complex duties arising from the administration of the penal system." *Ford*, 352 F.3d at 588 (citation and quotation marks omitted); *see also Weathers v. Rock*, No. 12-CV-1301, 2014 WL 4810309, at *4 (N.D.N.Y. Sept. 23, 2014) (explaining that the right of inmates to freely exercise a chosen religion "is not limitless, and may be subject to restrictions relating to legitimate penological concerns" (citing *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 2003))). Accordingly, a prisoner's Free Exercise claims are "judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (citation and quotation marks omitted).

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (alteration and quotation marks omitted); *see also Salahuddin*, 467 F.3d at 274–75 ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." (citation omitted)).[6] In determining

---

[6] The Second Circuit has acknowledged that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (citation and quotation marks omitted). The Second Circuit chose not to confront this question—or rather, not to alter the previous assumption that the substantial burden test is a threshold question. *Id.* at 220–21. This Court has already chosen to follow the analysis in *Holland* and thus will proceed under the

whether a belief is "sincere," "an individual . . . need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (citation, alteration, and quotation marks omitted). The relevant inquiry is not whether, as an objective matter, the belief is "accurate or logical." *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir. 1996).

A substantial burden exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *McEachin v. McGuinnis*, 357 F.3d 197, 202 n.4 (2d Cir. 2004) (citation, alterations, and quotation marks omitted); *see also Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *4 (S.D.N.Y. Feb. 2, 2017) (same). The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593–94. Once the plaintiff satisfies this burden, the defendants then "bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," although "the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (citation, alterations, and quotation marks omitted). In determining whether the defendants have put forth a legitimate penological interest justifying the impinging conduct, courts consider:

> whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

assumption that the substantial burden test is still valid. *See Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *4 n.5 (S.D.N.Y. Feb. 2, 2017).

*Holland*, 758 F.3d at 222–23 (citation and quotation marks omitted).  The rule requiring a legitimate penological interest is equally applicable to individual actions of prison personnel as it is to generally-applied policies or regulations.  *See Salahuddin*, 467 F.3d at 274 n.4 ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise." (citation omitted)).

### b. Application to Plaintiff

Plaintiff alleges that as a "devout, practicing Muslim," Bunch's deprivation order violated his First Amendment rights because he was "unable to perform his ablutions in accordance with his beliefs."  (TAC ¶¶ 34C, 46.)  Defendants do not contest the sincerity of Plaintiff's religious beliefs.  The Court, therefore, will assume for the purpose of resolving the instant Motion that Plaintiff's religious beliefs are sincerely held.

The Court turns, then, to whether Plaintiff has adequately alleged that his ability to exercise his religious beliefs was substantially burdened.  The Court cannot say that, as a matter of law, prevention of Plaintiff's ability to perform ablutions in connection with his daily prayers for eight hours is a de minimis burden unworthy of protection.  *See Page v. Breslin*, No. 02-CV-6030, 2004 WL 2713266, at *6 (E.D.N.Y. Nov. 29, 2004) (denying motion to dismiss First Amendment claim based on "denial of the opportunity to perform ablution on two occasions, one year apart" where the defendants "did not address whether the denials were based upon legitimate penal concerns").  However, given that it is "well-settled in this Circuit that missing two weekly religious services does not substantially burden a prisoner's right to freely exercise his religion," *Powell v. City of New York*, No. 14-CV-9937, 2016 WL 4159897, at *5 (S.D.N.Y. July 14, 2016) (collecting cases), *adopted by* 2016 WL 4147203 (S.D.N.Y. Aug. 3, 2016), the

Court is doubtful that Plaintiff could establish that missing his scheduled ablutions for a single eight-hour period substantially burdened his religious beliefs. *See Wright v. Bibens*, No. 17-CV-1917, 2018 WL 5724009, at *6 (D. Conn. Nov. 1, 2018) (holding that "[n]o reasonable jury could conclude that the denial of eight common fare meals over a four-day period substantially burdened the plaintiff's ability to practice his religion"); *Scott v. Uhler*, No. 16-CV-403, 2017 WL 9511167, at *4 (N.D.N.Y. Feb. 8, 2017) (dismissing claim based on missing a single Jumm'ah service because "[t]he isolated incident . . . does not give rise to a constitutional violation"), *adopted by* 2017 WL 1034792 (N.D.N.Y. Mar. 17, 2017); *JCG v. Ercole*, No. 11-CV-6844, 2014 WL 1630815, at *23 (S.D.N.Y. Apr. 24, 2014) ("The denial of one [kosher] meal does not substantially burden Plaintiff's rights under the Free Exercise clause as it constitutes no more than a de minimis harm." (citation and italics omitted)), *adopted by* 2014 WL 2769120 (S.D.N.Y. June 18, 2014).

However, even assuming Plaintiff's religious beliefs were substantially burdened, Defendants here have put forth a legitimate penal objective—prison safety—that justifies the impinging conduct, and Plaintiff includes that rationale in the TAC. (*See* TAC ¶ 43.) "As a penological goal, prison security is 'beyond question' legitimate, as prison security is 'central to all other corrections goals.'" *See Henry v. Schriro*, No. 10-CV-7573, 2011 WL 3370394, at *2 (S.D.N.Y. Aug. 2, 2011) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989)). "[E]ven where claims are made under the First Amendment," courts are hesitant to "substitute [their] judgment on difficult and sensitive matters of institutional administration." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987) (citation, quotation marks, and alterations omitted).

Plaintiff argues that Bunch's stated reason for shutting off water—to find a contraband item that could pose a danger to inmates—was irrational, unnecessary, and disproportionate.

(Pl.'s Mem. 24.) However, it is clear that shutting off water during contraband searches is not unusual. *See, e.g.*, *Silber v. Pallito*, No. 09-CV-73, 2011 WL 1225594, at *2 (D. Vt. Feb. 7, 2011) (explaining that "dry cells" without running toilet water are used when an inmate is suspected of having contraband "so that the inmate cannot flush the object away"), *adopted by* 2011 WL 1225588 (D. Vt. Mar. 31, 2011); *Ames v. Stigler*, No. 07-CV-430, 2009 WL 9097015, at *1 (N.D. Ill. Sept. 3, 2009) (dismissing Eighth Amendment claim based on water shut-off for several hours while a "search for contraband was performed . . . [t]o prevent disposal of contraband via the toilets and sinks"); *Reid v. Artus*, 984 F. Supp. 191, 192 n.23 (S.D.N.Y. 1997) (analyzing claim based on water shut-off "to facilitate a security search for contraband and to prevent another inmate from discarding contraband via a toilet"); *Collins v. Coughlin*, No.88-CV-650, 1990 WL 154717, at *2 (W.D.N.Y. Oct. 10, 1990) (noting that the defendant correction officers argued a "water shut-off was done as a normal operating procedure during housing unit searches to prevent inmates from disposing of contraband by flushing any such down the toilets"). Furthermore, although Plaintiff argues Bunch's stated rationale was not reasonable, he identifies no alternative means of preventing destruction of contraband during a search that would accommodate his beliefs at minimal cost to Sullivan. *See Turner v. Safley*, 482 U.S. 78, 91 (1987) ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." (italics omitted)).

Additionally, Plaintiff does not allege that he requested water for his ablutions and was denied. "[I]n order to state a claim upon which relief can be granted for a violation of a prisoner's First Amendment right to the free exercise of religion, the plaintiff must allege that he

requested the right to practice his religion and was denied that right." *Messina v. Mazzeo*, 854 F. Supp. 116, 137 (E.D.N.Y. 1994) (dismissing First Amendment claim where "the [c]omplaint does not allege that [the plaintiff] requested kosher food and that the request was denied"); *see also Marczeski v. Handy*, No. 01-CV-1437, 2004 WL 2476440, at *10 (D. Conn. Sept. 9, 2004) (dismissing First Amendment claim where the plaintiff "does not indicate if, when, or to whom she made a request that she be granted a meeting with a priest or rabbi; without a request, to one or more of the defendants, her First Amendment claim cannot be sustained" (citation omitted)). Plaintiff's assertion that Bunch must have been aware of Plaintiff's religious practices is thus insufficient without any allegation that Plaintiff sought water for his ablutions from Bunch or another officer and was denied. *See Valdez v. City of New York*, No. 11-CV-5194, 2013 WL 8642169, at *15 (S.D.N.Y. Sept. 3, 2013) (noting that in cases where plaintiffs have "complained that prison officials had failed to provide them with" a necessary accommodation or item for his or her religious practice, "it makes sense to require the plaintiffs to plead that, prior to bringing suit, they actually asked for the religious accommodations at issue and were denied" (collecting cases)), *adopted by* 2014 WL 2767201 (S.D.N.Y. June 17, 2014); *Nicholas v. Raro*, No. 95-CV-379, 1997 WL 255291, at *5 (W.D.N.Y. Apr. 7, 1997) ("Absent an allegation that plaintiff requested the right to practice his religion and was denied that right, plaintiff fails to state a claim for denial of religious freedom."); *Messina*, 854 F. Supp. at 137 ("[I]n order to state a claim upon which relief can be granted for a violation of a prisoner's First Amendment right to the free exercise of religion, the plaintiff must allege that he requested the right to practice his religion and was denied that right; that is, that he or she requested certain foods, diets, access to books, or religious services and was denied the same.").

Furthermore, the deprivation was imposed on Plaintiff's entire housing block, and thus cannot be said to have been designed to specifically target Plaintiff's religious practices. "The Second Circuit has held that '[i]t is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the 'incidental effect' of an otherwise valid neutral provision.'" *J.H. v. Bratton*, 248 F. Supp. 3d 401, 409 (E.D.N.Y. 2017) (citation and quotation marks omitted); *see also Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (explaining that with respect to prison actions that burden First Amendment rights, "the governmental objective must be 'legitimate' and 'neutral'" (alteration omitted) (quoting *Thornburgh*, 490 U.S. at 414)); *Ward v. Rabideau*, 732 F. Supp. 2d 162, 167 (W.D.N.Y. 2010) ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion." (citing *Pell*, 417 U.S. at 828)).

"Given the uncertainty of the infringement on free exercise in this case and the deference shown to prison officials . . . , [the Court] conclude[s] that [P]laintiff has not adequately set forth an allegation which states a deprivation of First Amendment rights." *Candelaria v. Coughlin*, 787 F. Supp. 368, 377 (S.D.N.Y. 1992), *aff'd*, 979 F.2d 845 (2d Cir. 1992). Plaintiff's First Amendment claim is therefore dismissed.[7]

### III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted. However, because this is the first formal adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry v. Inc. Vill. Of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that

---

[7] Because Defendants' Motion is granted in its entirety, the Court need not reach Defendants' argument that they are each entitled to qualified immunity. (Defs.' Mem. 22–25.)

"district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").

Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, this Action could be dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 84).

SO ORDERED.

Dated: March 29, 2019
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE